796 So.2d 1159 (2001)
Dennis ROPER, Appellant,
v.
CITY OF CLEARWATER, Appellee.
No. SC01-796.
Supreme Court of Florida.
August 23, 2001.
Patrick T. Maguire, Clearwater, FL, for Appellant.
Pamela K. Akin, City Attorney, City of Clearwater, Clearwater, FL; and Robert C. Reid, Randall W. Hanna, and Kenneth A. Guckenberger of Bryant, Miller and Olive, P.A., Tallahassee, FL, for Appellee.
LEWIS, J.
We have for review an appeal from the circuit court's order validating the City of Clearwater's proposed revenue bonds to be used in funding the development of a new major league baseball spring training facility. We have jurisdiction pursuant to article V, section 3(b)(2) of the Florida Constitution, and affirm the decision below.

MATERIAL FACTS AND PROCEEDINGS BELOW
Appellee, the City of Clearwater, Florida (the "City") proposed to issue certain Revenue Bonds (Spring Training Facility), Series 2001 (the "Bonds"), intending to use the proceeds to finance a portion of the cost of constructing and equipping a new major league baseball spring training facility (the "Spring Training Project"). The City has hosted the spring training activities of the Philadelphia Phillies major league baseball franchise ("The Phillies") for fifty-five years. These activities have *1160 historically been conducted at Jack Russell Stadium and the Carpenter Field complex.
In authorizing the Bonds, the Clearwater City Commission (the "City Commission") determined that the Philadelphia Phillies franchise generates a significant economic impact in the City and County as a direct result of the annual spring training activities, reportedly approximating $24.5 million each year. The Spring Training Project, which would replace the existing facility located within the City's corporate limits, would comprise a 7,000 seat baseball stadium, practice fields and related office and training facilities. It would be operated on behalf of the City by The Phillies in accordance with a Sports Facility Use Agreement (the "Use Agreement"). Pursuant to the Use Agreement, The Phillies will have primary responsibility for ongoing maintenance of the Spring Training Project.
At issue is the effect of Article IX of the Charter of the City of Clearwater (the "Charter")[1] on the issuance of the Bonds. Article IX requires a referendum if the bond issue exceeds $1 million, unless certain exceptions apply. One such exception applies to bonds which are revenue bonds for projects for "industrial development." In authorizing issuance of the Bonds,[2] the City Commission determined that the Spring Training Project was a project "for industrial development" as described in the Charter. It made this determination[3] *1161 based both upon a finding that the Spring Training Project generates a significant economic impact in the City and the County as a direct result of the spring training activities which occur within the City each year, and because the Spring Training Project, as a "Tourism Facility" within the meaning of section 159.27(11), Florida Statutes (2000), is included in the definition of an "industrial development project" as set forth in section 159.27(5), Florida Statutes.
On January 18, 2001, in accordance with Article IX of the City's Charter, the City Commission enacted Ordinance No. 6675-01 (the "Bond Ordinance"), providing for the issuance of the Bonds. As authority for the ordinance, the City cited "Chapter 166, Part II, Florida Statutes [the Municipal Home Rule Powers Act], and other applicable provisions of law." On January 1, 2001, the City was certified by the State of Florida as a "facility for a retained spring training franchise" in accordance with section 288.1162, Florida Statutes (2000). As the result of such certification, the City will receive monthly payments from the State of Florida pursuant to section 212.20, Florida Statutes (2000), in an annual amount of $500,000 a year for thirty years.
In December, 2000, the City and Pinellas County, Florida, entered into an Inter-local Agreement, pursuant to which Pinellas County will make monthly payments to the City in the annual amount of $587,650 for a period of twenty years. These two revenue streams (from the County and the State) are the sole source of repayment of the Bonds, and no funds or other assets of the City are pledged to repay the Bonds. Pursuant to the Use Agreement, the City must provide bond proceeds for payment of a portion of the costs of the Spring Training Project by no later than October 1, 2001.
Based upon this proposal, the City filed a complaint in circuit court, seeking to validate the Bonds. The appellant here, as a citizen and taxpayer, opposed validation, arguing that, because the City, in authorizing issuance of the bonds, had used the definition of a "project of industrial development" contained in section 159.2711, Florida Statutes (2000), it was required to comply with all applicable provisions of chapter 159. The City asserted that, while it had looked to section 159.27 for guidance in defining a project "for industrial development" as contained in its Charter (because the Charter did not provide a definition), it had not relied on chapter 159 as authority to issue the Bonds.
The trial court entered a final judgment validating the Bonds. In so doing, it determined, inter alia, that the "Charter permits the City to issue revenue bonds in excess of one million dollars without a referendum, if the bonds are to finance a project `for industrial development,'" and that the City was "not required to submit the issue to a Referendum." This timely appeal followed.

ANALYSIS
This Court's scope of review in bond validation cases is limited to the following issues: (1) whether the public body has the authority to issue the bonds; (2) whether the purpose of the obligation is legal; and (3) whether the bond issuance complies with the requirements of the law. *1162 See Poe v. Hillsborough County, 695 So.2d 672, 675 (Fla.1997). Here, appellant's challenge focuses on the City's authority to issue the bonds without complying with the requirements of chapter 159. However, in Pinellas County v. State, 776 So.2d 262 (Fla.2001), this issue appears to have been resolved contrary to appellant's position.
In Pinellas County, the County had proposed to incorporate a reclaimed water service component into its existing water and sewer facilities. It proposed to fund this project with sewer revenue bonds. Some of the affected municipalities which would be served by the project opposed the bond validation. The trial court denied the County's request to validate the bonds, finding that, pursuant to chapter 153, Florida Statutes, the County was required to obtain the additional consent of the municipalities within the service area (which it had not done) before adding a reclaimed water system to the existing water services. This Court reversed, holding that "the County, which was authorized by its home rule charter powers and the Special Acts to add reclaimed water improvements to its existing water and sewer system, was not required to comply with additional requirements of chapter 153, Florida Statutes, where it neither relied, nor was required to rely, upon such supplemental authority." Pinellas County, 776 So.2d 262, 264-65 (footnote omitted).
Here, as in Pinellas County, the local government acted pursuant to its home rule charter powers in authorizing issuance of the bonds in question. Article VIII, section 2, Florida Constitution, which provides that municipalities "may exercise any power for municipal purposes except as provided by law," has consistently been construed as giving municipalities broad home rule powers. Art. VIII, § 2(b), Fla. Const.; see Boschen v. City of Clearwater, 777 So.2d 958, 963 (Fla.2001); State v. City of Sunrise, 354 So.2d 1206, 1209 (Fla.1978). Pursuant to this constitutional provision, the Legislature enacted the Municipal Home Rule Powers Act (codified in chapter 166, Florida Statutes), which provides that municipalities have full authority to issue bonds. See §§ 166.021, 166.111(1), 166.141, Fla. Stat. (2000); see also Boschen, 777 So.2d at 963; Washington Shores Homeowners' Ass'n v. City of Orlando, 602 So.2d 1300, 1302 n. 2 (Fla.1992).
The City's Charter also vests it with broad authority to issue bonds. See Charter art. I, § 1.01, art. IX. Further, Ordinance No. 6675-01, through which the City authorized issuance of the Bonds, refers only to "Chapter 166, Part II, Florida Statutes [the Municipal Home Rule Powers Act], and other applicable provisions of law," and makes no reference to chapter 159. See Bond Ordinance § 1. Although the City looked to chapter 159 to interpret the phrase, "industrial development," as used in its charter, it did not thereby invoke chapter 159 as a source of authority in exercising its charter powers to issue the bonds,[4] and did not need to meet the requirements of chapter 159.
*1163 In Pinellas County, this Court found that the local government was not required to utilize the supplemental statutory authority which contained requirements the cities asserted had not been met in issuing the subject bonds. Pinellas County, 776 So.2d 262, 264-65; cf. also City of Boca Raton v. State, 595 So.2d 25, 29 (Fla.1992) (holding that the City of Boca Raton, in levying the special assessment at issue, did not have to follow the requirements of chapter 170, Florida Statutes, which provided a "supplemental, additional, and alternative method of procedure for the benefit of all cities, towns, municipal corporations of the state," but was free to exercise its home rule powers to develop its own procedures); Taylor v. Lee County, 498 So.2d 424, 426 (Fla.1986) (observing that, "in areas in which a non-charter county has authority to issue bonds, it may choose between adopting an ordinance pursuant to its home rule power or adopting it pursuant to another [supplemental and additional] statutory authority"); Speer v. Olson, 367 So.2d 207, 213 (Fla. 1978) (observing that "an act, when it recites that it is an additional and supplemental grant of power, may be used in addition to other laws on the same subject, but may be rejected by a public entity and another applicable law used in its place"). Here, similarly, chapter 159 provides that the authority contained therein is supplementary, and not in derogation of any powers of a local agency otherwise conferred. Section 159.43, Florida Statutes (2000) specifically provides:
159.43. Liberal construction.
Part II of this chapter, being necessary for the prosperity and welfare of the state and its inhabitants, shall be liberally construed to effect the purposes thereof; shall be, and be deemed, authority in addition to, and shall provide alternative methods for, any other authority provided by law for the same or similar purposes; and is supplemental to and not in derogation of any powers of any local agency otherwise conferred. The criteria and requirements of this part are applicable only to projects financed under authority of this part, except as otherwise expressly incorporated by references in other provisions of law.

(Emphasis supplied.) Thus, as in Pinellas County, the taxpayer's argument here that a referendum was required to issue the Bonds fails.
Both the record evidence and applicable case law support the trial court's conclusions here. Chapter 159 is clear and unequivocal in providing that its authority and application are supplemental to, and do not invalidate, other sources of authority for undertaking the activities authorized by the statutory provisions. See § 153.20, Fla. Stat. (1997). Review of the applicable resolutions and the ordinance in this case *1164 reflects that the City did not invoke, nor did it need to invoke, chapter 159 in attempting to issue the industrial development bonds.[5] Therefore, the trial court correctly found that the City was not bound by the referendum requirement of the Charter. Based upon the foregoing, we affirm the final judgment validating the bonds.
It is so ordered.
WELLS, C.J., and SHAW, HARDING, ANSTEAD, PARIENTE, and QUINCE, JJ., concur.
NOTES
[1] The City's home rule charter, Ordinance No. 6371-99, was approved by the electors on March 9, 1999. Formerly, the Charter derived from Ordinance No. 1830, as approved by the electors on December 12, 1978.
[2] See City of Clearwater, Pinellas County, Fla., Ordinance 6675-01 (January 18, 2001).
[3] Section 3(A) of the Bond Ordinance, which sets forth certain legislative findings by the City Commission, provides:

SECTION 3. FINDINGS. It is hereby ascertained, determined and declared that:
A. The Philadelphia Phillies is a major league baseball franchise which has been conducting its spring training program in the City for the prior 54 years.
B. The Philadelphia Phillies generates a significant economic impact in the City and the County as a direct result of the spring training activities which occur within the City each year, and that such impact has been reported to the City Commission to be approximately $24.5 million each year, and that in order to preserve this economic benefit for the City, the City must undertake the Project, and the City has further determined that the Project is in furtherance of its municipal purposes to provide for the health and general welfare of the citizens and residents of the City, and that undertaking the Project is a valid municipal purpose.
C. The Project constitutes a "Tourism Facility" as defined in Section 159.27(11), Florida Statutes, and is included within the definition of an industrial development project set forth in Section 159.27(5), Florida Statutes, and that the Project constitutes a "project for industrial development" within the meaning of Article IX of the City's Charter.
D. No funds (including but not limited to ad valorem tax revenues of the City) or property of the City will be pledged to the repayment of the Bonds, and no property of the City will be pledged to secure the Bonds, and the Bonds will be secured solely by, and repayable solely from the County Payments and the State Payments, neither of which would otherwise be payable to the City in the event the City did not undertake the Project.
E. The Pledged Revenues will be sufficient to pay all of the principal of and interest on the Bonds as the same become due, and to make all required sinking fund, reserve and other payments required under this Ordinance.
F. The principal of and interest on the Bonds and all required sinking fund, reserve and other payments shall be made solely from the Pledged Revenues as herein provided. The Issuer shall never be required to levy ad valorem taxes on any property therein to pay the principal of and interest on the Bonds or to make any of the required sinking fund, reserve or other payments, and any failure to pay the Bonds shall not give rise to a lien upon any property of the Issuer, except the Pledged Revenues.
G. The total indebtedness of the Issuer, within the meaning of the Issuer's charter, does not exceed twenty per centum (20%) of the current assessed valuation of all real property located in the Issuer, and will not exceed such amount after issuance of the Bonds.
[4] Cf. Where terms which are key to the analysis have not otherwise been defined, the Florida courts have looked to various sources for definitions. Cf. Barr v. State, 731 So.2d 126, 130 (Fla. 4th DCA 1999) (using Black's Law Dictionary as a reference in determining the meaning of the statutory term "solicitation"); Powell v. State, 508 So.2d 1307, 1310 (Fla. 1st DCA 1987) (holding that dictionary definitions may be used as sources where a statute does not define a term in question); Calio v. Equitable Life Assurance Soc'y, 169 So.2d 502, 504 (Fla. 3d DCA 1964) (holding that private parties to a contract containing a term which is not defined in the statute from which it is taken can agree upon a reasonable definition of the term, stating that where "there is a complete absence of legislative expression as to the meaning of statutory terms, individuals involved therewith should be permitted to reasonably provide definitions therefor," provided, however, that the definitions "may not be such as to violate or obstruct or restrict the spirit, meaning and clear intention of the legislature"). In this case, it was reasonable for the City to look to the definition of an "industrial development project," as set forth in section 159.27(5), Florida Statutes (which included a "Tourism Facility," as defined in Section 159.27(11), Florida Statutes), in determining whether the Bonds which it sought to issue were "revenue bonds for ... industrial development" within the meaning of article IX of the City's charter. Cf. Union Trust Co. v. Lucas, 125 So.2d 582, 586 (Fla. 2d DCA 1960) (agreeing with the appellant that, although "the word `building' was not actually defined in the Zoning Ordinance ... the failure of the ordinance to define the word `building' did not invalidate the ordinance since the word has a recognized meaning in the law and is properly the subject of judicial interpretation").
[5] There is ample authority under Florida law for local governments to issue bonds. See art. VIII, § 2(b), Fla. Const. (providing that municipalities "may exercise any power for municipal purposes except as provided by law"); Boschen v. City of Clearwater, 777 So.2d 958, 963 (Fla.2001) (observing that article VIII, section 2(b) has repeatedly been construed as giving municipalities broad home rule powers, and that, pursuant to the Municipal Home Rule Powers Act codified in chapter 166, Florida Statutes, municipalities have full authority to issue bonds) (citing §§ 166.021, 166.111(1), 166.141, Fla. Stat. (1999)).